# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS

―――――――――――――――――――――――――――
|  |  |  |
|---|---|---|
| NBTC US INC., | ) |  |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) | Civil Action No.: |
|  | ) |  |
| HASHLAND INC.; ZHU YONGJUN; DOUDOU WEN; | ) |  |
| JINPING TIAN; XINGXIN GUO; | ) |  |
| ANTELOPE ENTERPRISE HOLDINGS USA INC.; | ) |  |
| AEHL US LLC; AND DI WU, | ) |  |
|  | ) |  |
| Defendants. | ) |  |

―――――――――――――――――――――――――――

## COMPLAINT AND JURY DEMAND

**ROBINSON & COLE LLP**

Benjamin M. Daniels (Bar No.4706180NY)
One State Street
Hartford, CT 06103
Tel. No. (860) 275-8223
Email: bdaniels@rc.com

Theresa E. Lane (*pro hac vice* forthcoming)
One Boston Place, 26th Floor
Boston, MA 02108
Tel. No. (617) 557-5924
Email: tlane@rc.com

*Attorneys for Plaintiff NBTC US Inc.*

## TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION ................................................................................................ 1

PARTIES ............................................................................................................................. 3

JURISDICTION AND VENUE ......................................................................................... 4

FACTUAL BACKGROUND .............................................................................................. 4

    A.   The technology of cryptocurrency mining.......................................................... 4

    B.   NBTC contracts with Hashland ......................................................................... 5

    C.   Hashland's misleading and fraudulent conduct leads to breaches and default. .................. 9

COUNT I
BREACH OF CONTRACT ................................................................................................. 13

COUNT II
NEGLIGENCE .................................................................................................................... 14

COUNT III
BREACH OF GOOD FAITH AND FAIR DEALING ..................................................... 15

COUNT IV
FRAUDULENT MISREPRESENTATION AND INDUCEMENT ............................... 15

COUNT V
CONVERSION .................................................................................................................... 18

COUNT VI
UNJUST ENRICHMENT ................................................................................................... 18

COUNT VII
NEGLIGENT MISREPRESENTATION .......................................................................... 19

COUNT VIII
Civil RICO (18 U.S.C. § 1964(c)) ..................................................................................... 20

RESERVATION OF RIGHTS ........................................................................................... 23

PRAYER FOR RELIEF ...................................................................................................... 23

JURY TRIAL DEMAND .................................................................................................... 23

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Statutes**

18 U.S.C. § 1343......................................................................................................20

18 U.S.C. § 1961......................................................................................................20

18 U.S.C. § 1962......................................................................................................20

28 U.S.C. § 1331........................................................................................................4

28 U.S.C. § 1367........................................................................................................4

28 U.S.C. § 1391........................................................................................................4

Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1964(c)) ................1, 4, 20, 23

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**

_____
                                                    )
NBTC US INC.,                                       )
                                                    )
        Plaintiff,                                  )
                                                    )
v.                                                  )      Civil Action No.:
                                                    )
HASHLAND INC.; ZHU YONGJUN; DOUDOU WEN;             )
JINPING TIAN; XINGXIN GUO;                          )
ANTELOPE ENTERPRISE HOLDINGS USA INC.;              )
AEHL US LLC; AND DI WU,                             )
                                                    )
        Defendants.                                 )
_____)

## COMPLAINT AND JURY DEMAND

Plaintiff NBTC US Inc. ("Plaintiff" or "NBTC") brings this Complaint against the "Hashland Defendants" (Defendants Hashland Inc., its CEO Zhu Yongjun, and its registered directors DouDou Wen, Jinping Tian, and Xingxin Guo) and the "Antelope Defendants" (Defendants Antelope Enterprise Holdings USA Inc., AEHL US LLC and its registered agent Di Wu), for breach of contract, negligence, breach of covenant of good faith and fair dealing, fraudulent misrepresentation, fraudulent inducement, conversion, unjust enrichment, negligent misrepresentation, and a civil violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1964(c)). In support of its claims, NBTC alleges as follows:

## NATURE OF THE ACTION

1.      This case involves a scheme in which Hashland Defendants represented themselves as a legitimate business that could provide a stable data center to host NBTC's cryptocurrency machines. The parties entered a contract—the "Hosting Agreement" or "Agreement—under which Plaintiff prepaid over a million dollars for Hashland's services. In

-1-

exchange, Hashland Defendants were supposed to provide a data center for Plaintiff's cryptocurrency operation.

2.      The Hashland Defendants never intended to build the data center and made a series of misrepresentations to mislead NBTC. When NBTC discovered the truth, Hashland Defendants misled NBTC about the availability of third-party data centers and overstated the safety of moving cryptocurrency machines. Hashland Defendants designed this scheme to prevent NBTC from discovering that Hashland could not meet its obligations under the contract between the parties. Hashland Defendants then misrepresented the nature of the transfer of the machines and claimed title to the machines during the final transfer. This scheme was also designed to prevent NBTC from discovering that Hashland Defendants had worked with the Antelope Defendants to claim title to NBTC's mining equipment and divert profits into Hashland's wallet.

3.      In the end, Hashland Defendants induced NBTC to lose millions of dollars but provided almost no services. This caused millions in lost profits and damaged NBTC's machines as Hashland Defendants moved them from data center to data center. They also worked in concert with Antelope Defendants to keep NBTC's mining equipment and abscond with the profits from that Equipment.

4.      NBTC seeks to recover over $900,000 in security deposits and prepaid hosting fees, lost profits of over $2.4 million, damages and punitive damages for fraud, damages for damaging Plaintiff's Equipment, treble damages under civil provisions of RICO, and damages stemming from the conversion of Plaintiff's cryptocurrency miners and mining proceeds. Plaintiff also seeks the return of its mining equipment.

## PARTIES

5.      NBTC is a Delaware corporation with a principal place of business of 1192 Murphy Avenue, Unit 15011, Irvine, California 92623. NBTC owns cryptocurrency mining machines and deploys them to facilities around the world.

6.      NBTC is an indirect, wholly owned subsidiary of The9 Limited, an entity registered in the Cayman Islands, with its principal place of business in Shanghai, China.

7.      Hashland is a Texas company with its principal place of business in Fort Stockton, Texas. Hashland manages and operates data centers in the United States that house and run cryptocurrency miners. It contracts with customers to provide power and internet access and related services, which allows customers to deploy their miners to mine cryptocurrency. Hashland is the successor-in-interest of Crypto Mine Group LLC.

8.      Zhu Yongjun has represented himself to NBTC as the CEO of Hashland and is a resident of Texas.

9.      DouDou Wen is a registered director of Hashland and is registered as the CEO of Hashland. She is a resident of Plano, Texas.

10.      Jinping Tian is a registered director of Hashland and is a resident of Texas.

11.      Xingxin Guo is a registered director of Hashland and is a resident of Texas.

12.      Antelope Enterprise Holdings USA Inc. is a company incorporated under the laws of Delaware and a wholly owned subsidiary of Antelope Enterprise Holdings Ltd. Antelope Enterprise Holdings USA Inc. operates data centers by transforming natural gas into electrical energy using state-of-the-art gas generators and has a principal place of business in New York, New York.

13.     AEHL US LLC, formerly known as Million Star US Inc., is a Texas corporation with a principal place of business in Austin, Texas. It is a subsidiary of Antelope Enterprise Holdings USA Inc.

14.     Di Wu is the CEO of AEHL US LLC and is a resident of California.

## JURISDICTION AND VENUE

15.     This court has specific personal jurisdiction over all Defendants because Defendants intentionally conducted business in Texas and those actions in Texas relate to NBTC's claims. The court also has general jurisdiction over the defendants which are domiciled in or reside in Texas. Finally, the court has jurisdiction over the Hashland Defendants because they consented to jurisdiction in the Agreement.

16.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because this action arises, in part, under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1964(c)).

17.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's related state and common law claims.

18.     Venue is proper under 28 U.S.C. § 1391 because many Defendants reside or are domiciled in the Eastern District of Texas including Defendant DouDou Wen. Additionally, under Section 14.8 of the Agreement, the Hashland Defendants agreed that they would bring all causes of action related to the Agreement in the state or federal courts in Texas.

## FACTUAL BACKGROUND

### A.     The technology of cryptocurrency mining.

19.     NBTC mines cryptocurrency, which is digital currency that is secured by cryptography.

20.     Many cryptocurrencies are based on blockchain technology, a decentralized network of computers used to record a series of transactions. Generating cryptocurrency is referred to in the industry as "mining," which consists of computers (called "miners"), typically working together, that process large amounts of data to solve complex mathematical operations to validate cryptocurrency transactions and record them on blockchain. The first computer (i.e., miner) to solve the problem presented by the blockchain receives the next block of cryptocurrency and the process begins again.

21.     These miners require sophisticated hardware to process and complete mathematical operations. Miners are expensive, and hundreds of miners typically are part of an efficient cryptocurrency mine.

22.     Mining cryptocurrency also requires a large amount of electricity to power the miners on a continuous basis.

**B.     NBTC contracts with Hashland**

23.     In March 2023, NBTC and Crypto Mine Group LLC entered into a hosting agreement ("Original Agreement") (Exhibit A), in which Crypto Mine Group LLC agreed to deploy 988 mining machines in its data center in Pecos County, Texas.

24.     NBTC paid a security deposit in the amount of $150,595 and prepaid a hosting fee of $168,770.

25.     Crypto Mine Group LLC was supposed to supply a data center to house the 988 machines.

26.     After signing the Original Agreement, Crypto Mine Group LLC changed its name to Hashland Inc.

27.      A few months later, Hashland and NBTC agreed to expand their relationship. On October 25, 2023, Hashland and NBTC signed the Hosting Agreement (Exhibit B), which terminated the Original Agreement.

28.      Under the Hosting Agreement, Hashland agreed to deploy the previous 988 mining machines ("Original Equipment") plus another 4,947 mining machines ("Equipment") in Hashland's newly constructed data center facility, Pike's Peak Plant ("Pike's Peak") in Fort Stockton, Texas.

29.      Hashland also made several promises to provide NBTC certain installation, hosting, and related services.

a.  Sections 2.5. and 4.1., required Hashland to properly install the Equipment in the data center. Under Section 2.5, if Hashland were to move or reconfigure the Equipment it would be at Hashland's sole costs and expense.

b.  Section 4.7., required Hashland to provide sufficient personnel to install and commission the Equipment and ensure it was in working order after the initial installation.

c.  Section 4.2., required Hashland to provide certain hosting services, including all applications, systems, space, information technology infrastructure and functions to host the Equipment in working order ("Hosting Services").

d.  Sections 2.3., 2.6., 4.4., and 4.5., required Hashland to provide utility, electrical and internet services sufficient to operate the Equipment.

e.  In Section 11.4., Hashland represented and warranted to NBTC that it consented to render the Hosting Services and fully perform its obligations under the Agreement.

30. Hashland also had obligations should there be a failure to connect the equipment or if there were power and network downtime.

    a. Section 2.8. provided that if the failure to connect the Equipment is due to Hashland's fault, Hashland will make appropriate adjustments in the hardware configuration to address the cause of failure.

    b. Sections 5.1. and 5.4. required Hashland to avoid unscheduled power and network downtime.

31. Hashland also made several promises to ensure the security of NBTC's Equipment and bear responsibility for all losses or damages to the Equipment.

    a. Section 4.3. required Hashland to provide reasonable and customary security, including, but not limited to, security systems, security cameras, security personnel, and other security items or procedures. Further, if Hashland's breach of the Agreement, misconduct, or negligence caused any loss or damage to the Equipment, Hashland must compensate NBTC for such loss or damage.

    b. Section 4.8. required Hashland to take all practical and customary means to prevent unauthorized access to the Equipment.

    c. Further, Section 5 of Appendix 1 to the Agreement required Hashland to keep the Equipment in safe custody and to be responsible for loss or damage to the Equipment.

    d. Section 14.6. makes Hashland responsible for the acts and omissions of any subcontractor, as if those acts and omissions have been carried out by Hashland itself.

32. Finally, Hashland made several promises about any disruptions in service.

a. Under Section 4.11., Hashland agreed to keep NBTC informed about interruptions and maintenance that might affect the Hosting Services or Equipment.

b. Under Section 5.2., Hashland agreed to continually monitor the data centers for any problems or faults and to inform NBTC as soon as possible if there is a disruption of service.

c. Under Section 5.5., Hashland agreed to provide NBTC with a weekly report on the performance of the Equipment, including numbers of installed units, performance of the Equipment, downtime of the Equipment, relevant events and incidents, and uptime of the Equipment.

d. Under Section 2 of Appendix 1, Hashland agreed to notify NBTC as soon as possible if any of the Equipment was damaged on delivery if co-locating the Equipment.

33.     In exchange, NBTC agreed to pay Hashland significant fees including an estimated monthly hosting fee of $753,864.53 for 5,935 machines ("Hosting Fee").

34.     Under Section 6.5, NBTC had to pay one month of the Cost component of the Hosting Fee as the Security deposit. This totaled $753,864.53 and consisted of the $150,595 security deposit under the Original Agreement and the new security deposit of $603,269.53 under the Agreement.

35.     NBTC had the right to terminate the Agreement. Under Section 5.1., NBTC could unilaterally terminate if there was a "Default," which occurred if total time of failure of electrical power or lack of internet connectivity during a given month exceeded 36 hours.

36.     Furthermore, under Section 13.6, NBTC had the right to send a notice of default and give Hashland 10 days to cure the default. If there was no cure, NBTC had a right to immediately terminate for cause and recoup "all losses and damages . . . in the amount of Customer's direct and indirect damages and lost profits as calculated by Customer taking into consideration hash rate of the Equipment, BTC closing price for each day and mining difficulty."

37.     Under Section 6.5., if NBTC terminated the Agreement, Hashland must return the Security deposit within five calendar days following the date of the termination.

### C. Hashland's misleading and fraudulent conduct leads to breaches and default.

38.     In September 2023, Zhu Yongjun and NBTC engaged in discussions about locating NBTC miners in Hashland's self-constructed gas generated data center, Pike's Peak.

39.     Before signing the Agreement, Hashland sent NBTC its mine leasing agreement with Century Gas Processing LLC, in which Century Gas Processing LLC would provide Hashland with access to Pike's Peak for mining equipment.

40.     On September 21, 2023, Zhu Yongjun represented that Hashland would connect the Equipment to the electricity at Pike's Peak in one month.

41.     On October 12, 2023, Zhu Yongjun requested that NBTC pay the security deposit and represented that the construction of Pike's Peak would begin soon.

42.     On October 19, 2023, Zhu Yongjun requested that NBTC pay the security deposit to purchase the electricity generator for Pike's Peak.

43.     The Agreement became effective on October 25, 2023, and was supposed to continue for twelve months ("Initial Term").

44.     A few days later, NBTC paid Hashland the added security deposit of $603,269.53, which Zhu Yongjun had represented was needed to purchase the electricity generator equipment for Pike's Peak.

45.     NBTC delivered 5,935 units of Equipment to Hashland to be installed at Pike's Peak.

46.     Hashland was supposed to connect the machines by November 2023, but failed to do so.

47.     Five days after the expected connection date, on November 6, 2023, NBTC asked when Hashland would connect the Equipment. Zhu Yongjun responded that Hashland had not yet bought the electricity generator, but that the rest of the construction of Pike's Peak was in process.

48.     Over the next two weeks, Hashland failed to connect the Equipment and promised that a connection was imminent. On November 9 and November 14, 2023, NBTC again asked when Hashland would connect the Equipment. Zhu Yongjun responded that if the electricity were unavailable, Hashland would compensate NBTC for the loss of mining revenue.

49.     On November 16, 2023, NBTC asked whether Hashland had received the electricity generator equipment at Pike's Peak. Zhu Yongjun responded that the generator had not been bought and that Hashland was finding it difficult to buy an electricity generator in the current market. Zhu Yongjun promised that Hashland would connect the Equipment in December 2023 and compensate NBTC for lost profits incurred to that point. Zhu Yongjun also stated that for each delayed month, Hashland would forgo its share of profits and allow NBTC to retain all profits as compensation for the delayed connection of equipment. Zhu Yongjun asked NBTC to send a statement with the total amount of revenue Hashland owed to NBTC.

50.     Two days later, Hashland changed its story. On November 18, 2023, Zhu Yongjun told NBTC that Hashland would not connect the Equipment at Pike's Pike. Instead, Hashland planned to move NBTC's Equipment to a data center in Mississippi. Zhu Yongjun promised that Hashland could deploy 3,000 machines to this data center and that Hashland would be responsible for the relocation and all related fees. When NBTC expressed concern that Equipment could be easily damaged if relocated, Zhu Yongjun suggested NBTC wait for the construction of Pike's Peak to be completed.

51.     Two weeks later, the miners still were not connected. On December 5, 2023, NBTC requested Hashland connect 900 miners. Zhu Yongjun responded that Hashland could guarantee that it would connect 3,000 by the end of the month and reiterated that Hashland would not collect its share of the profits.

52.     The delays and misrepresentations continued over the next two months. From January 2024 to February 2024, Hashland Defendants sent several messages saying that the company was looking for interim solutions to connect NBTC's Equipment in third-party data centers because Hashland had yet to construct Pike's Peak. Hashland Defendants represented that the company would pay NBTC for the down time while part of Equipment was connected to third-party data centers.

53.     Finally, at the end of February 2024, Hashland promised it had found a solution. Zhu Yongjun stated he had found a new data center supplier, APLD, and relocated NBTC's Equipment. Hashland Defendants deployed and connected NBTC Equipment in APLD's data center, but this was only operational for one week.

54.     During the week that NBTC's Equipment was connected to the APLD data center, NBTC identified that out of the 5,935 Equipment units, 1,483 were broken.

55.     NBTC also learned that Hashland Defendants had connected 800 of NBTC's miners to a third-party wallet address and diverted the proceeds to that wallet. Hashland Defendants later admitted that it had been diverting the mining proceeds and conceded that they should return the proceeds to NBTC. They never returned the proceeds.

56.     The Equipment was disconnected from the APLD data center after one week.

57.     In March 2024, Hashland Defendants moved NBTC's Equipment to another data center in Austin, Texas. But Hashland Defendants were still not able to provide full capacity of electric load to operate the substantial number of remaining unconnected units.

58.     In March 2024, Hashland Defendants represented that they could move the Equipment to a fourth data center. On March 24, 2024, Zhu Yongjun represented that a contract had been signed between Million Star US Inc. and a new data center provider. Di Wu signed the agreement as Owner of Million Star US Inc. (which is now AEHL US LLC). Under this agreement, 1425 of NBTC's miners would be in the new data center in McAllen, Texas.

59.     On March 27, 2024, Zhu Yongjun represented to NBTC that Antelope covered the new data center and going forward NBTC should trade with the Antelope Defendants.

60.     A portion of the Equipment was deployed at this McAllen data center and ran until May 2024.

61.     Despite NBTC cooperating with Hashland Defendants multiple times to move the Equipment to other data center sites, Hashland Defendants failed to provide stable hosting services.

62.     Furthermore, Hashland never constructed Pike's Peak.

63.     On April 26, 2024, NBTC learned that Hashland Defendants had connected 1425 of NBTC's miners in the McAllen data center to its own mining wallet address without

authorization. Since Hashland Defendants have stopped all communication with NBTC, NBTC does not know the whereabouts of the Equipment.

64.     NBTC also learned that Hashland Defendants claimed title to the Equipment deployed at the McAllen data center, which Antelope Defendants knew or should have known belonged to NBTC. Antelope Defendants failed to conduct adequate diligence and failed to prevent the connection of the miners to a third-party wallet.

65.     On May 24, 2024, NBTC provided written Notice of Default under the Agreement because, among other reasons, Hashland Defendants have failed to provide uninterrupted hosting services.

66.     Hashland Defendants failed to timely cure the Default.

67.     On June 28, 2024, NBTC provided a second notice of Default under the Agreement, stating that Hashland Defendants have failed to provide uninterrupted hosting services and had been using NBTC Equipment to divert proceeds without authorization.

68.     On October 1, 2024, NBTC provided written notice of termination of the Agreement.

69.     Hashland Defendants have failed or refused to refund fees rightfully owed to NBTC or compensate NBTC for lost profits and damages.

70.     To date, Hashland Defendants and Antelope Defendants are in possession of the Equipment and it is deployed in a third-party data center without authorization. Upon information and belief, Hashland Defendants and Antelope Defendants continue to divert the Equipment continue into Hashland's wallet.

**COUNT I**
**BREACH OF CONTRACT**

71.     NBTC realleges paragraphs 1 through 70.

72.     The Agreement constitutes a valid and enforceable contract.

73.     NBTC fully performed and complied with all material terms of the Agreement.

74.     Hashland materially breached and repudiated the Agreement by, *among other things*,

    a.  Failing to provide the Hosting Services and maintain the Equipment in working order in violation of Section 4.2. of the Agreement;

    b.  Failing to provide utility, electrical, and internet services sufficient to operate the Equipment in violation of Sections 2.3., 2.6, 4.4., and 4.5. of the Agreement;

    c.  Failing to avoid unscheduled power and network downtime in violation of Sections 5.1. and 5.4. of the Agreement;

    d.  Failing to take all practical and customary means to prevent unauthorized access to the Equipment in violation of Section 4.8. of the Agreement;

    e.  Failing to accept responsibility for loss or damage to the Equipment that Hashland and/or subcontractors caused in violation of Section 14.6. of the Agreement and Section 5 of Appendix 1;

    f.  Failing to keep NBTC informed of interruptions and maintenance affecting the Hosting Services and Equipment in violation of Section 4.11. of the Agreement;

    g.  Failing to refund the unused security deposit in violation of Section 6.5. of the Agreement.

75.     As a direct and proximate result of Hashland's repeated and material breaches of the Agreement, NBTC has suffered damages.

## COUNT II
## NEGLIGENCE

76.     NBTC realleges paragraphs 1 through 75.

77.     Hashland owed NBTC a duty to prevent loss or damage to NBTC's Equipment, when Hashland agreed to co-locate at Peak's Pike and other data centers.

78.     Hashland breached its duty to NBTC by, *among other things*, negligently failing to take all reasonable, customary, or adequate measures to prevent loss or damage to the Equipment.

79.     As a result of that negligence or carelessness of Hashland, NBTC suffered losses and damages, including 1,483 broken Equipment units.

**COUNT III**
**BREACH OF GOOD FAITH AND FAIR DEALING**

80.     NBTC realleges paragraphs 1 through 79.

81.     As discussed above, the Agreement agreed and executed on October 25, 2023, constitutes a contract between Hashland and NBTC.

82.     Hashland had a duty to abide by the implied covenant to act in good faith and deal fairly with NBTC.

83.     Hashland's refusal to execute and abide by the terms of the Agreement as agreed upon has injured NBTC's right to receive a benefit under the contract.

84.     Hashland acted in bad faith and with a dishonest purpose.

85.     Hashland breached the implied obligation of good faith and fair dealing by engaging in the conduct set forth above, all to the loss and damages of NBTC.

**COUNT IV**
**FRAUDULENT MISREPRESENTATION AND INDUCEMENT**

86.     NBTC realleges paragraphs 1 through 85.

87.     Hashland, through its CEO, made several material misrepresentations to NBTC both during and after the signing of the Agreement:

a.  Hashland Defendants misrepresented that in the Agreement they would provide NBTC with a newly constructed data center, Pike's Peak, which would be powered by electricity generated by the conversion of natural gas;

b.  Hashland Defendants misrepresented that Pike's Peak would be operational for NBTC's Equipment upon the agreed upon schedule;

c.  Hashland Defendants misrepresented that they would use the security deposit of $603,269.53 to purchase a generator for the Pike's Peak facility;

d.  Hashland Defendants misrepresented that the Pike's Peak facility would be operational in November 2023;

e.  Hashland Defendants misrepresented the reason for the delay in opening the Pike's Peak facility, asserting that it was from a lack of electricity and not because of the cost of purchasing a generator;

f.  Hashland Defendants misrepresented in November 2023 that the Pike's Peak facility would be operational in December 2023;

g.  Hashland Defendants mispresented that they would compensate NBTC for lost profits;

h.  Hashland Defendants mispresented that they had a long-term agreement with APLD to house NBTC's Equipment;

i.  Hashland Defendants mispresented that they would operate NBTC's miners for NBTC's benefit.

88.  These representations were false or misleading:

a.  Hashland Defendants did not provide NBTC with a newly constructed data center, Pike's Peak;

- 16 -

b. Hashland Defendants never intended to make the operational data center at Pike's Peak available upon the agreed upon schedule;

c. Hashland Defendants did not use the security deposit of $603,269.53 to purchase a generator for the Pike's Peak facility;

d. The Pike's Peak facility was not operational by November 2023;

e. The reason for the delay in opening the Pike's Peak facility was, among other things, because Hashland Defendants never bought a generator with the security deposit;

f. The Pike's Peak facility was not operational by December 2023;

g. Hashland Defendants have not compensated NBTC for all lost profits;

h. NBTC equipment was only operational at the APLD facility for one week;

i. Hashland Defendants were only able to connect a fraction of the NBTC Equipment at the new data center in March 2024;

j. Hashland Defendants operated some of NBTC's miners and diverted the proceeds of NBTC's miners into Hashland Defendants' and third-party's cryptocurrency wallets;

89. Hashland Defendants made these statements either knowing or believing that they were false, or with reckless indifference to the truth.

90. Hashland Defendants made these misrepresentations intending to induce NBTC to sign the Agreement, which had the potential to commit NBTC to pay Hashland about $9,046,374.36 over the twelve-month, Initial Term of the Agreement.

91. Hashland Defendants also made misrepresentations that it would compensate NBTC for its lost profits for every month Pike's Peak was not operational. Hashland Defendants

- 17 -

paid NBTC compensation for the month of November 2023 and part of December 2023. But Hashland Defendants have not paid the profits owed to NBTC from the end of December 2023 to September 2024, which is the sum of $2,437,389.158.

92.     NBTC relied on Hashland Defendants' false representations and omissions as true and acted or refrained from acting to NBTC's detriment based on such representations.

93.     As a direct and proximate result of the Hashland Defendants' misrepresentations of fact, NBTC has suffered and continues to suffer harm and monetary damages beyond the breach of contract damages, including lost profits stemming from the disruption in service in an amount of $2,437,389.158.

## COUNT V
## CONVERSION

94.      NBTC realleges paragraphs 1 through 93.

95.     Hashland Defendants and Antelope Defendants wrongfully exercised control over the Equipment belonging to NBTC.

96.     Hashland Defendants used NBTC's Equipment to NBTC's detriment by diverting miner proceeds.

97.     Hashland Defendants wrongfully exercised control over the proceeds of using NBTC's Equipment while it was in Hashland's possession.

98.      NBTC demands that the Equipment and all proceeds be returned to NBTC by Hashland Defendants and Antelope Defendants.

## COUNT VI
## UNJUST ENRICHMENT

99.     NBTC realleges paragraphs 1 through 98.

100.     Hashland Defendants have benefitted from using NBTC's Equipment without authorization and diverting its proceeds to its own account.

101.     Hashland Defendants harmed NBTC by using the Equipment and diverting the proceeds and NBTC receiving nothing in return.

**COUNT VII**
**NEGLIGENT MISREPRESENTATION**

102.     NBTC realleges paragraphs 1 through 101.

103.     Hashland Defendants owed NBTC a duty to provide NBTC with accurate information about the construction and functionality of Pike's Peak.

104.     Hashland Defendants failed to exercise reasonable care in providing NBTC with truthful and accurate representations, including, without limitation:

    a.   The representation by Hashland Defendants that it would use NBTC's security deposit to purchase an electricity generator for Pike's Peak;

    b.   The representation by Hashland Defendants to NBTC that Pike's Peak would be operational by November 2023;

    c.   The representation by Hashland Defendants to NBTC that Pike's Peak would be operational by December 2023;

    d.   The representation by Hashland Defendants to NBTC that Hashland would compensate NBTC for its loss profits.

105.     The representations, as described above, which Hashland Defendants provided to NBTC to induce NBTC into believing that Hashland could provide hosting services, were false and misleading or turned out to be false or misleading.

106.     NBTC relied on the representations of Hashland Defendants.

107.     As a direct and proximate result of Hashland Defendants' negligent misrepresentations, NBTC has suffered monetary damages.

## COUNT VIII
## Civil RICO (18 U.S.C. § 1964(c))

108.     NBTC realleges paragraphs 1 through 107.

109.     Defendants committed alleged unlawful conduct in violation of 18 U.S.C. § 1964(c).

110.     Each Defendant is a "person" able to hold a legal or beneficial interest in property under 18 U.S.C. § 1961(3).

111.     Hashland Defendants and Antelope Defendants constitute an enterprise under 18 U.S.C. § 1961(4) because they are a union or group of individuals associated in fact, although not a legal entity. The enterprise affects interstate commerce in that they contracted with foreign entities to conduct business in the state of Texas and several Defendants do not reside in Texas but conduct their enterprise with acts in Texas.

112.     Defendants knowingly, willfully, and unlawfully conducted or participated, directly or indirectly, in the enterprise's affairs through a pattern of racketeering activity under 18 U.S.C. §§ 1961(1), 1961(5) and 1962(c). Defendants had the specific intent to engage in the substantive RICO violations alleged in this Complaint.

113.     Defendants' violations of state and federal law constituted a repeated and continuous course of conduct spanning a period from about October 2023 to the present, which they intended to obtain money through false representations, fraud, deceit, and other improper unlawful means. There is a continued threat of repetition of such conduct.

114.    Defendants committed a pattern of racketeering that included more than two related predicate acts that constitute indictable offenses of wire fraud under 18 U.S.C. § 1343 that involved a scheme or artifice to defraud to obtain money or property, including the following acts that occurred through interstate wires and that are plead with specificity as to time and place above:

a.  Hashland Defendants misrepresented that in the Agreement they would provide NBTC with a newly constructed data center, Pike's Peak, which would be powered by electricity generated by the conversion of natural gas;

b.  Hashland Defendants misrepresented that Pike's Peak would be operational for NBTC's Equipment upon the agreed upon schedule;

c.  Hashland Defendants misrepresented that they would use the security deposit of $603,269.53 to purchase a generator for the Pike's Peak facility;

d.  Hashland Defendants misrepresented that the Pike's Peak facility would be operational in November 2023;

e.  Hashland Defendants misrepresented the reason for the delay in opening the Pike's Peak facility, asserting that it was from a lack of electricity and not because of the cost of purchasing a generator;

f.  Hashland Defendants misrepresented in November 2023 that the Pike's Peak facility would be operational in December 2023;

g.  Hashland Defendants mispresented that they would compensate NBTC for lost profits;

h.  Hashland Defendants mispresented that they had a long-term agreement with APLD to house NBTC's Equipment;

    i.    Hashland Defendants mispresented that they would operate NBTC's miners for NBTC's benefit.

    j.    Di Wu, on behalf of Hashland Inc., signed a leasing agreement with the third-party data center as the owner of Antelope Enterprise Holding USA Inc.'s subsidiary, AEHL US LLC. The Antelope Defendants knew or should have known that Hashland Defendants did not own the mining equipment hosted at the third-party data center.

    k.    Once located in a third-party data center, Hashland Defendants diverted the mining proceeds from NBTC's equipment to Hashland Defendants' own wallet address.

115.    Defendants knew that the use of wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.

116.    Defendants acted intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

117.    Each of the predicate acts affected interstate commerce because Defendants used the instrumentalities of interstate commerce including email and WeChat to communicate from Texas to Plaintiff in China.

118.    The unlawful actions of Defendants have directly, legally, and proximately caused and continue to cause injuries to NBTC's business. Plaintiff seeks an award of damages in compensation for, among other things, the funds Defendant fraudulently obtained from NBTC and the damages for the fraud that Defendants perpetrated on NBTC by lying about the development of the Pike's Peak facility and misleading NBTC about refunding lost profits, security deposits, and otherwise covering NBTC's losses.

119.    NBTC accordingly seeks an award of three times the damages it sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized by statute.

## RESERVATION OF RIGHTS

NBTC reserves all rights to amend, modify, or supplement this Complaint, including bringing additional claims and substituting parties to the extent authorized by this Court or by law.

## PRAYER FOR RELIEF

FOR THESE REASONS, NBTC requests the following relief:

1.    NBTC's damages of more than $75,000, equal to the damages suffered because of the unlawful conduct, practices, and activities engaged in by Defendant, plus any penalties or exemplary damages permitted by law;

2.    Plaintiff's interest, costs, and disbursements;

3.    Treble damages, the costs of the suit, and reasonable attorneys' fees under 18 U.S.C. § 1964(c);

4.    Return of the Equipment to NBTC; and

5.    Granting such other, further, or different relief as this Court deems just and equitable.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

**Dated**: October 4, 2024                    **ROBINSON & COLE LLP**


*/s/ Benjamin M. Daniels*
Benjamin M. Daniels (Bar No.4706180NY)
One State Street
Hartford, CT 06103
Tel. No. (860) 275-8223
Email: bdaniels@rc.com

*/s/ Theresa E. Lane*
Theresa E. Lane (*pro hac vice forthcoming*)
One Boston Place, 26th Floor
Boston, MA 02108
Tel. No. (617) 557-5924
Email: tlane@rc.com


*Attorneys for Plaintiff NBTC US Inc.*